IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 13, 2022 Session

## CLAUDE ELLIS v. MELISA JANE GODFREY ELLIS

Appeal from the Chancery Court for Bradley County
No. 2011-CV-148      Jerri S. Bryant, Chancellor

No. E2020-00869-COA-R3-CV

In this divorce case, Claude Ellis ("Husband") challenges the trial court's division of the marital estate, the award of spousal support and attorney's fees to Melisa[1] Jane Godfrey Ellis ("Wife"), and the trial court's finding that Husband dissipated marital assets. We hold that the trial court misclassified some of the assets in contention as marital, and we remand for a reconsideration of the division of the marital estate in light of this holding. Because the issue of attorney's fees as alimony in solido is only properly considered after the issues of estate valuation and distribution are settled, we vacate the award of alimony in solido, so that the trial court has the opportunity to reconsider the award if the court finds it necessary. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part and Vacated in Part; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Amy J. Farrar, Amanda Moore, and Kate Nyquist, Murfreesboro, Tennessee, for the appellant, Claude Ellis.

Nathan L. Kinard and Harold L. North, Chattanooga, Tennessee, for the appellee, Melisa Jane Godfrey Ellis.

## OPINION

---

[1]Wife's first name is sometimes spelled "Melissa" in the documents filed with the trial court, but in her handwritten signature it is spelled "Melisa," as in many other documents in the record. Wife is often referred to as "Lisa," the name she apparently goes by.

## I. BACKGROUND

The parties were married on December 26, 1996. This was Wife's first marriage and Husband's third; he had three children from prior marriages. One child was born to the parties, who had reached adulthood by the time of the divorce trial. Husband filed for divorce on June 24, 2011. He presented the parties' prenuptial agreement, asking the trial court to enforce it and divide their property accordingly. The trial court invalided the agreement, finding that Husband did not provide full and fair disclosure of the nature, extent, and value of his property and holdings. On Husband's interlocutory appeal, this Court affirmed the invalidation of the prenuptial agreement. *Ellis v. Ellis*, No. E2013-02408-COA-R9-CV, 2014 WL 6662466, at *1 (Tenn. Ct. App. Nov. 25, 2014).

Following remand from the first appeal, Wife's first counsel, Martha Meares and Paul R. Dillard, filed a motion to withdraw, which was granted. Meares and Dillard then filed a notice of attorney's charging lien against Wife's property in the amount of $368,259.95 for unpaid attorney's fees and expenses. Wife's new counsel filed an objection to the attorney's charging lien, requesting "a hearing to determine the reasonableness of the unpaid legal fees and expenses." This issue was reserved until after the conclusion of trial.

The divorce trial took place on February 19-21, 2019. The trial court heard the testimony of the parties, two of Husband's business associates, and Husband's accountant. Husband was a successful businessman, so there were numerous assets in contention that the trial court was required to classify and divide, which it did in detail in an extensive order and chart captioned "Master Asset List." The trial court summarized its classification and division of assets and liabilities as follows:

> the Court finds the total net marital estate to be $3,026,378, after deducting the total marital liabilities of $718,561.44, the Campus Loan, which originated during the marriage in violation of the statutory injunction. This number includes $921,805 in unaccounted for or dissipated assets being the $600,000 in receivables by Husband and the $321,805 excess cash at closing per Exhibit 198. This also includes the items awarded to Wife in the amount of $273,727 as part of the marital assets. However, because Husband's businesses, which were acquired during the marriage, through his income, credit, and efforts during the marriage, are entangled with [his business associate] Mr. Triplett and covered by the campus loan, the Court finds that the parties' interest in marital property is difficult to equitably divide with Wife. Pursuant to Husband's testimony, he felt trapped in this marriage, and therefore, wanted Wife to come away from this marriage with absolutely nothing. His efforts have attempted to accomplish this. Given the fact that

2

he is the person more at fault in this case, the Court finds Husband to have entangled his assets in a way that attempts to thwart this Court's awarding anything to the Wife. Husband failed to rebut any presumption that any assets acquired during the marriage, which are presumed to be marital, are not marital. He has provided no proof of the amounts of any of the loans in this case or any security interest in the assets on [the Master Asset List]. The Court resolves issues of credibility in favor of Mr. Triplett and against Husband.

In order to equitably divide the parties' marital assets, the Court awards Wife a judgment against Husband in the amount of $1,239,462. Wife will retain a lien on all of Husband's interest in marital property to secure the payment of this amount. . . . Husband shall pay on this judgment at the rate of $100,000 semi-annually. While this amount may seem quite large, the Court will note that Husband is receiving $3,026,378 in marital assets, which includes the $921,000 that he has dissipated or not accounted for. Additionally, Husband is receiving $859,000 in separate assets.

A careful reading of the above reveals that some of the numbers appear to be irreconcilable. The trial court found the total net marital estate to be $3,026,378, stating that this amount "includes the items awarded to Wife in the amount of $273,727 as part of the marital assets." But then the trial court found that "Husband is receiving $3,026,378 in marital assets," which is 100% of the net marital estate. We need not dwell too long on this apparent discrepancy, because our holding that the trial court misclassified at least one large asset, which will be discussed further below, necessitates vacating the division of the marital estate and remand for reconsideration.

The trial court awarded Wife alimony in futuro in the amount of $3,600 per month. Regarding Wife's request for alimony in solido, the trial court stated as follows:

Wife lacks sufficient funds to pay her own legal expenses and the only way she has been able to hire an attorney and pay for the same is through the generosity of her mother. The Court finds she is not being awarded substantial funds of liquid assets from which to pay her legal fees, based on the division of the parties' marital property. It is clear from this case that much of the costs to Wife have been in an effort to protect her interest in any assets that may be marital and to protect her right to alimony. . . .

Husband has the resources to pay Wife's attorney fees as *alimony in solido*. Husband has a much greater earning capacity than Wife. He has many more financial resources, including income from his business, as well as from other

properties. . . . The Court will secure Wife's *alimony in solido* for attorney fees by granting her a judgment against Husband, in an amount to be determined at a subsequent hearing[.]

Following the divorce trial, the trial court entered an order on February 13, 2020, stating the following in pertinent part:

That pursuant to the novelty of the issues presented and the argument of counsel with regard to the conflict between the Attorney's Charging Lien filed by Meares and the award of attorney fees yet to be determined in the Court's Order of July 10, 2019, and in consideration of the issue raised by Meares with regard to the attorney/client privilege, the Court finds that two (2) separate hearings are necessary. The first hearing shall address the objection to Attorney's Charging Lien and the second hearing shall address the attorney fee award as set out in the Court's Order of July 10, 2019.

[Husband] shall not be present for the hearing on the Attorney's Charging Lien and shall be precluded from participation in said hearing.

\*　　\*　　\*

That the Court shall conduct a hearing on the objections filed by [Wife] to determine whether or not said objections to the attorney charging lien are well-taken. If the Court finds that [Wife] is not responsible for fees objected to, [Husband] shall not be liable for those fees. If the Court finds that all or a portion of the fees objected to are proper in the hearing on the attorney charging lien, the Court shall then set a hearing on the award of attorney fees pursuant to the July 10, 2019 Order to determine the obligation of [Husband].

That after entry of the Order from the above hearing on the objections, the Court shall then conduct a hearing on the award of attorney fees against [Husband]. [Husband] and his attorney shall have a right to object to the reasonableness and necessity of either all, or a portion of the bill for Attorney Meares from the attorney charging lien hearing, and the affidavit of fees submitted by [Wife's] present attorney, by presenting evidence at the hearing on the award of attorney fees.

Husband objected to his exclusion from the first hearing on Meares' charging lien, arguing that he should have a right to be present and participate in a hearing where the trial court would determine the reasonableness and necessity of attorney's fees for which he may be held responsible. The trial court overruled this objection, and the first hearing took

place on March 2, 2020.  Wife and former counsel Meares testified.  The trial court entered a ten-page order analyzing at length the evidence and applicable law, and finding that Meares represented Wife "faithfully, honestly, and consistently" and "discharged her duties with the utmost good faith."  Noting that "[t]his was a difficult case and the interwoven business and personal expenses was quite complicated," the trial court concluded that "the fees requested by [Meares and Dillard] were both reasonable and necessary for the preparation of this case for [Wife] and are ordered to be paid by [Wife] and form a basis of a lien on behalf of Attorney."

Then, the second hearing took place for the purpose of determining Husband's responsibility for Wife's attorney's fees as alimony in solido.  The parties stipulated that the fees requested by Wife's second attorney, totaling $21,625, were reasonable and necessary, and the trial court awarded Wife those fees.  Husband and his counsel were present and allowed the opportunity to argue, present evidence, and cross-examine witnesses.  At this hearing, both former counsel Meares and Dillard testified, as did the parties.  The trial court entered another order containing thorough and detailed findings and conclusions, stating in pertinent part:

> This Court found, during the [divorce] trial, that [Husband] was using his businesses as a personal checking account and hiding that information in the business records.  Researching those business records took an exorbitant amount of time in this case. . . . The Court finds this amount of time, particularly over the last nine (9) years of dealing with this case, is all reasonable and necessary.  [Husband] has come forth with no proof to the contrary.
>
> The trial took many hours.  This hearing over the bill was lengthy and [Husband] has not proven any charge was either unreasonable or unnecessary in this matter.  Had [Husband] been more forthcoming with his information, the discovery would have been much easier.  Had [Husband] not moved assets and disclosed information before he borrowed money and had he not changed titles to some of his assets, there would have been less money incurred in attorney fees.  The Court hereby finds that all the attorney fees requested by Ms. Meares are both reasonable and necessary in this case.
>
> *       *       *
>
> The Court finds [Husband] is not credible concerning his monthly income and expenses, or his assets.
>
> *       *       *

5

During the divorce, [Husband] took excess cash out of his business, in the amount of $182,000 in 2016, $62,000 in 2014, $77,000 in 2014, pursuant to trial exhibit 198. All of these were without an accounting. Further, trial exhibits 314 and 315 show [Husband] bought and sold properties in this case without court approval and in violation of the statutory injunction.

[Meares] postponed her fees in an effort to continue to represent a client who had no separate assets and whose husband said, after many years of marriage, wife was entitled to only one-half interest in a motorhome. Ms. Meares did good work on behalf of her client and while at first blush the Court might find $360,000 in requested attorney fees to be unreasonable, the Court has considered the time devoted to the legal services in this case. The number of years this case has been pending, the novelty and difficulty of the questions involved, the skill performed by the service, the conduct of [Husband], and the hourly rate in this case are not contested. The Court has considered the other factors in *Connors v. Connors*, [594 S.W.2d 672 (Tenn. 1980)] including the results obtained, the experience, reputation and ability of the lawyer representing [Wife] all appear to be reasonable.

Husband timely filed a notice of appeal.

## II. ISSUES PRESENTED

Husband presents the following issues:

1. Whether the trial court erroneously classified Husband's separate property as marital property.
2. Whether the evidence preponderates against the trial court's division of the marital estate.
3. Whether the trial court abused its discretion by awarding alimony in futuro.
4. Whether the trial court abused its discretion in awarding alimony in solido in the form of her attorney's fees.
5. Whether the trial court erred in finding that Husband had dissipated certain assets.

Wife raises the issue of whether she should be awarded attorney's fees on appeal.[2]

---

[2] As a preliminary argument, Wife asserts that Husband has waived any issue regarding the trial court's classification of the parties' property by failing to comply with Tenn. Ct. App. R. 7, which provides that "[i]n any domestic relations appeal in which either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt, the brief of the party raising the issue shall contain, in the statement of facts or in an appendix, a table in a form substantially similar to the form attached hereto." Wife did not raise this issue in her statement of the issues

## III. ANALYSIS

## A. Classification and Division of Assets

Husband challenges the trial court's classification and division of assets and debts. Our Supreme Court has defined the applicable standard of review of issues regarding property classification and division in divorce proceedings:

> The classification of particular property as either separate or marital is a question of fact to be determined in light of all relevant circumstances. *See Langford v. Langford*, 220 Tenn. 600, 421 S.W.2d 632, 634 (1967); *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995). This Court gives great weight to a trial court's decisions regarding the division of marital assets, and we will not disturb the trial court's ruling unless the distribution lacks proper evidentiary support, misapplies statutory requirements or procedures, or results in some error of law. *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). As to the trial court's findings of fact, "we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary." *Id.* However, we accord no presumption of correctness to the trial court's conclusions of law. *Id.*

*Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245-46 (Tenn. 2009).

The trial court must classify all of the assets possessed by the divorcing parties as either separate or marital before equitably dividing the marital estate. *Larson-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010). "Separate property is not part of the marital estate and is therefore not subject to division." *Id.* The governing statute, Tenn. Code Ann. § 36-4-121(b), provides the following definitions of marital and separate property, in pertinent part:

> (1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date. . . .

---

presented. Husband presented a Rule 7 table in substantial compliance under the circumstances here, and we do not find he has waived the issue of classification and division of the assets in contention.

(B)(i) "Marital property" includes income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation;

\*      \*      \*

(D) As used in this subsection (b), "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine;

\*      \*      \*

(2) "Separate property" means:
(A) All real and personal property owned by a spouse before marriage . . . ;
(B) Property acquired in exchange for property acquired before the marriage;
(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1); [and]
(D) Property acquired by a spouse at any time by gift, bequest, devise or descent[.]

After classifying and valuing marital property, a trial court must equitably divide it between the parties. *See* Tenn. Code Ann. § 36-4-121(a)(1); *Luplow v. Luplow*, 450 S.W.3d 105, 109 (Tenn. Ct. App. 2014) (citing *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001)). An equitable division of marital property does not require that the property be divided equally. *Id.* at 109-10 (citing *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002)). Nor does it require that each party receive a share of every item classified as marital property. *Morton v. Morton*, 182 S.W.3d 821, 833-34 (Tenn. Ct. App. 2005) (quoting *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998)). According to Tenn. Code Ann. § 36-4-121(c),

In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability,

8

earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

> (B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. . . .

(11) The amount of social security benefits available to each spouse; and

(12) Such other factors as are necessary to consider the equities between the parties.[3]

The trial court has broad discretion in devising an equitable division of marital property. *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). This Court will not overturn the trial court's determination unless "it is inconsistent with the statutory factors or lacks proper evidentiary support." *Trezevant v. Trezevant*, 568 S.W.3d 595, 607 (Tenn. Ct. App.

---

[3] In an amendment to this statute that became effective on March 31, 2022, our legislature added a thirteenth factor: "The total amount of attorney fees and expenses paid by each party in connection with the proceedings; whether the attorney fees and expenses were paid from marital property, separate property, or funds borrowed by a party; and the reasonableness, under the factors set forth in Rule 1.5 of the Tennessee Rules of Professional Conduct, and necessity of the attorney fees and expenses paid by each party." Tenn. Code Ann. § 36-1-121(c)(13).

2018) (citing *Baggett v. Baggett*, 422 S.W.3d 537, 543 (Tenn. Ct. App. 2013)).

Husband argues that the trial court misclassified several assets as marital, when they should have been classified as his separate holdings. The parties submitted to the trial court the Master Asset List, in which they stipulated to the value of most of the assets and indicated their assertions as to how they should be classified. The trial court took this list and made handwritten notes designating the court's valuations, classifications, and to whom it awarded the property. The trial court attached and incorporated this list as an exhibit to its divorce decree. In addition, the trial court made specific findings regarding some of the assets in the body of its order.

Two of the largest assets in contention are Wedgecorp, a Tennessee corporation primarily involved in real estate development, and Quality Machining Service, LLC ("QMS"). Wedgecorp, started by Husband well before the marriage, is his separate property. The trial court found that QMS, which is owned 51% by Wedgecorp and 49% by David Triplett, began during the marriage. The court classified QMS as marital property. In its order, the trial court found as follows regarding these two entities:

> The largest asset held by Husband is a corporation called Wedgecorp, which he owned prior to the marriage. . . .Wedgecorp has a current value of $1,667,000. Since Wedgecorp owns 51% of QMS, Wedgecorp alone has a value of $527,000 and is Husband's separate property. QMS, whose value is $1,140,000 was started during the marriage and is marital property. It was created by Husband and Mr. Triplett.
>
> Mr. Triplett . . . verified QMS began in 1998, and it initially involved himself, Mr. Winter, Mr. Spinks and Wedgecorp. The Court credits this testimony and not that of Husband, who stated this business began in 1996. Mr. Triplett further testified that over the years he and Husband acquired [full] ownership of QMS[.]
>
> Real property was purchased for QMS by Husband during the marriage, and later sold partially to Mr. Triplett. QMS is owned 51% by Wedgecorp and 49% David Triplett. The marital portion of QMS is $581,400 and Mr. Triplett's portion is $558,600.
>
>    &ast;  &ast;  &ast;
>
> The Court finds Wife did not substantially contribute to Husband's business Wedgecorp (absent QMS), and as such, it was and remains Husband's separate property. However, QMS, which is owned 51% by Wedgecorp,

10

began *during* the marriage. Husband's income and efforts during the marriage were used to purchase land and equipment for this business. QMS is, therefore, marital property. While Wife did not work for QMS, she did contribute to the home and raised the parties' child. Wife became a stay-at-home mother at Husband's insistence, after Husband found out she was pregnant. Under T.C.A § 36-4-121(5)(A), Wife's contribution as a homemaker and parent is to be given the same weight as that of Husband as wage earner. She has not held a job since their marriage in 1996, other than after the parties' separation. Husband put Wife on the payroll at Wedgecorp and paid her a salary. Wife drew approximately $43,000 per year from Wedgecorp or QMS for purposes of buying groceries, having spending money, improving the [marital residence] on Osment Road, and caring for the parties' minor child. It was also a benefit to Husband for tax purposes to have Wife as one of his employees.

It is undisputed that Husband has never held a direct, personal ownership interest in QMS. All of the evidence supports the trial court's conclusion that "QMS is owned 51% by Wedgecorp and 49% David Triplett." Moreover, the trial court expressly held that Wedgecorp is Husband's separate property, a proposition that Wife does not dispute. Wife states in her brief that "it is not surprising that the trial court did not use precise terminology when discussing Wedgecorp and QMS" and argues as follows:

The trial court did say that Wedgecorp was Mr. Ellis' separate property. And the trial court was fully aware that Mr. Ellis did not directly own QMS[;] rather, it was 51% owned by Wedgecorp. There is a simple explanation to reconcile this apparent inconsistency. The court envisioned QMS's value as an increase in the value of Wedgecorp. That the trial court conceptualized awarding QMS as a subset of Wedgecorp's value is evident in its statement that Ms. Ellis did not substantially contribute to "Wedgecorp (*absent QMS*)." The negative inference from the phrase "absent QMS" is that she did "substantially contribute" to Wedgecorp in relation to its investment in QMS.

(Citations to record in original omitted). There is language in the trial court's order, quoted above, that may reasonably support this interpretation. However, the trial court also found that "Wife did not participate in any of his businesses," and further stated as follows:

Wife testified she helped Husband as much as she was allowed during the marriage. She went out with potential clients and entertained people on houseboats and on trips they took. She also testified she cooked and took food to the houseboat to entertain clients and stayed behind to clean after everyone left on Sundays. She further testified she would attempt to help

11

Husband with his receipts, both before and after the marriage, and would do some cleaning at Wedgecorp. The Court finds these two contributions did not cause Wedgecorp to increase in value.

When Wife was asked "did you ever do anything for QMS?" she answered "no." The trial court expressly found that Wife did not substantially contribute to the preservation and appreciation of Wedgecorp. The evidence in the record does not support a finding that Wife substantially contributed to QMS.

QMS is a corporate entity separate from Wedgecorp. It is not owned by Husband and consequently cannot be classified as marital property. To consider QMS as merely an increase in the value of Wedgecorp would be to improperly disregard the corporate forms of these entities. Wife did not argue at the trial level that the corporate veil of either Wedgecorp or QMS should be pierced on equitable grounds. She argues for the first time on appeal that although "the veil-piercing question was not presented to the trial court . . . there was ample evidence to support piercing the veil." This Court was recently presented with a similar situation in *Barton v. Barton*, No. E2019-01136-COA-R3-CV, 2020 WL 6580562, at *4 (Tenn. Ct. App. Nov. 10, 2020), and held:

> Wife now attempts to raise the issue, for the first time on appeal, of whether the trial court impliedly pierced the corporate veil in her recasting of Husband's issues and points to the evidence in the record relative to the factors considered when a court is called upon to pierce the corporate veil of an LLC. *See Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 829-30 (Tenn. Ct. App. 2012); *Federal Deposit Ins. Corp. v. Allen*, 584 F.Supp. 386, 397 (E.D. Tenn. 1984). In her arguments, however, she does not cite us to the record where the trial court was ever called upon to pierce the corporate veil of the LLCs involved. Indeed, the record contains only two references to this concept, both in pleadings filed by Husband, who certainly was not advocating for its application. . . .
>
> Furthermore, the court's order contains no consideration of any of the eleven *Allen* factors, which courts in this State use to determine whether to pierce the corporate veil of a limited liability company. *Edmunds*, 403 S.W.3d at 829-30; *Allen*, 584 F.Supp. at 397. Nor does the order contain any language by the trial court demonstrating that it was ever asked to pierce the corporate veil or thought it necessary to do so. Parties will not be permitted to raise issues on appeal that they did not first raise in the trial court. *Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006). Accordingly, Wife having not raised this issue in the trial court, the issue is waived.

As in *Barton*, we hold that Wife waived her argument regarding piercing the corporate veil by not raising it in the trial court.

The trial court found the value of Wedgecorp's 51% interest in QMS to be $581,400. Our holding that it was misclassified as marital means that the size of the marital estate has changed by a significant amount. We vacate the finding that QMS is marital property and remand to the trial court for an opportunity to reconsider the distribution of the marital estate in light of this modification.[4] *See, e.g., Anderson v. Anderson*, No. M2018-01248-COA-R3-CV, 2019 WL 3854663 at *1 (Tenn. Ct. App. Aug. 19, 2019) ("Based on this change of classification, the trial court should also consider whether the change in value necessitates a revision of the equitable division of the marital estate").

The real property upon which QMS primarily operates is located at 1455 Blythe Ferry Road. Husband argues that the trial court also misclassified his 50% interest in it as marital. The trial court found as follows regarding this asset:

> 1455 Blythe Ferry Rd. — This property Husband received from his brother in 2005. This property was acquired during the marriage. He sold half . . . of his interest in this property to David Triplett. This is the property upon which QMS operates. QMS pays Husband and Mr. Triplett $12,000 per month each for rent. From that rent payment, each pays $6,000 toward the "Campus Loan" and each keeps $6,000 for their personal use. QMS uses the building, and QMS pays rent on the building. . . . The parties have stipulated the value of this asset to be $1,270,000. *Since Husband's business owns 51% of it*, the Court assigns his value as $635,000, and the Court awards that to Husband; however, it is marital property. Recently money was borrowed against this building. At the closing of the new loan, Husband took $182,000 in cash per Mr. Triplett. Husband cannot remember what he did with the money. This negatively impacts his credibility.

(Italics added). The italicized language above suggests that the trial court found this real estate to be owned either by Wedgecorp or QMS−it is not entirely clear which. However, there is no evidence in the record that it is owned by either corporate entity.

Husband testified that his brother transferred 1455 Blythe Ferry to him "in probably" 1995, before the marriage in 1996. On January 14, 2005, both Husband and

---

[4] Moreover, regarding the debt encumbering some of the QMS property, the trial court held that "[s]ince the Court has assigned the marital portion of QMS to Husband, it finds that 51% of this debt is to be considered marital. That amount is $718,561.44." We also vacate the finding that the debt of QMS is marital, further complicating the division of the marital estate and providing another reason to remand for the trial court's reconsideration.

Wife signed a quitclaim deed transferring an undivided one-half interest in the property to Husband and David Triplett as tenants in common. Mr. Triplett testified that 1455 Blythe Ferry is owned by him and Husband, and the title reflects this ownership. Because the trial court's classification of the real property at 1455 Blythe Ferry is based on the misconception that it was owned by Wedgecorp or QMS, we vacate the court's ruling in this regard for reconsideration of the proper disposition of this asset.

The quitclaim deed was proffered into evidence and the trial court heard testimony regarding the circumstances surrounding its execution, including Wife's testimony. However, the trial court made no reference to the quitclaim deed in its order. On appeal, the parties offer competing theories and arguments regarding the effect of the quitclaim deed on the classification of the property. On remand, the trial court should consider and address the effect of the quitclaim deed on the classification of 1455 Blythe Ferry and the resultant division of the marital estate.

The marital residence is located at 1098 Osment Road in Cleveland, Tennessee. The trial court ruled as follows regarding the marital residence:

> This property was allegedly obtained by Husband a few years prior to the marriage; however, he did not record the deed until 2005. The deed recordation shows that the value of the property, at that time, was $150,000. The parties have stipulated its current value is $350,000. The Court finds that Wife has substantially contributed to the value increase of this property. Wife's work in supervising and participating in the remodeling of the home certainly has increased its value. The Court finds the property has a $200,000 increase in value. The Court finds the $200,000 increase in value to be marital property. The first $150,000 in value is separate property of the Husband. Because this was separate property of Husband's, the Court awards this property to Husband. Wife shall retain a lien in the amount of $200,000 on the property to secure part of her division of marital property. This lien will accrue interest at the statutory rate. Husband has five years to pay off this lien. His payments will be paid in equal monthly installments.
>
> Wife did help this piece of property increase in value. There were many photographs provided and testimony regarding the renovations the parties had done during the marriage. . . . Wife used her money to enhance the value and provided value as the homemaker and caretaker of the parties' child.

Husband argues that the trial court erred in finding that Wife substantially contributed to the preservation and appreciation of the marital residence. Husband asserts that the entire value of the marital residence should be classified as his separate property.

At the time of trial, Wife had lived in the marital residence for almost 22 years, serving as the homemaker, housekeeper, and primary caregiver to the parties' child. She testified that she used her money to pay for improvements to the house such as painting, wallpaper, and landscaping. Wife did yard work, including landscaping and mowing. She painted and wallpapered some of the rooms herself. She paid household bills. Our General Assembly has specifically provided that "'substantial contribution' may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager." Tenn. Code Ann. § 36-4-121(b)(1)(D). The evidence does not preponderate against the trial court's classification or disposition of the marital residence.

Husband also takes issue with the trial court's imposition of a lien to secure Wife's interest in the marital residence. Tennessee Code Annotated section 36-4-121(e)(2) provides that "[t]he court may impose a lien upon the marital real property assigned to a party as security for the payment . . . pursuant to property division." The trial court, after having the opportunity to see and evaluate the parties' demeanor and testimony, and their conduct in litigation for many years, found that Husband "wanted Wife to come away from this marriage with absolutely nothing," and that his considerable and extensive "efforts have attempted to accomplish this." Under the particular circumstances of this case, we do not find the trial court abused its discretion in imposing the lien.

Husband challenges the trial court's classification of two parcels of real estate located at 3811 and 3807 Old Tasso Road. The trial court ruled that because they were purchased by Husband and Mr. Triplett during the marriage, Husband's portion was marital property. Husband states that he owned the property before the marriage, sold it, and then bought it back during the marriage. He argues that his "ownership merely changed forms, as he took this separate asset . . . and converted it to another asset (cash) and then used that asset to re-purchase" the property. We do not agree. The property was acquired by Husband during the course of the marriage. The fact that he may have once owned it before the marriage is not particularly relevant, when the asset used to effectuate the sale and re-purchase of the property is non-identifiable, entirely fungible cash. We affirm the trial court's classification of Husband's interest in 3811 and 3807 Old Tasso Road as marital property.

### B. Alimony in Solido: Wife's Attorney's Fees

As our Supreme Court has stated,

It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. *See* Tenn. Code Ann. § 36–5–121(h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*,

15

944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). . . . As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36–5–121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997). Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, *see Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, *see Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. *See id.* at 185.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011) (emphasis added). This Court has also held that in making an award of attorney's fees as alimony in solido, "a court must carefully consider the relevant factors set forth in Tenn. Code Ann. § 36-5-121(i)." *Yattoni-Prestwood v. Prestwood*, 397 S.W.3d 583, 597 (Tenn. Ct. App. 2012); *accord Ellis v. Ellis*, 621 S.W.3d 700, 708 (Tenn. Ct. App. 2019).

In *Barton*, 2020 WL 6580562 at *1, we vacated the trial court's division of the marital estate and remanded "for further consideration of the valuation of the parties' net marital business interests." There, as in this case, the husband challenged the trial court's award of attorney's fees as alimony in solido. The *Barton* Court held:

Although an issue is also raised as to the propriety of the award of attorney's fees to Wife, we do not reach this issue[.] An award of attorney's fees in divorce cases is treated as a form of spousal support, and the award is characterized as alimony in solido. The issue is only properly considered after the foregoing issues of estate valuation and distribution are settled. We therefore vacate the trial court's award of attorney's fees. *See Trezevant*, 568 S.W.3d at 624 ("[T]he court's award of attorney's fees to Wife is also vacated by virtue of the need to re-evaluate the marital estate.").

*Id.* at *11 (internal quotation marks and citations omitted). As in *Barton*, we vacate the award of alimony in solido to allow the trial court the opportunity to reconsider it, after its reconsideration of the distribution of the marital estate. The trial court has already twice heard and ruled on the propriety and reasonableness of the attorney's fees charged by Meares and Dillard in exhaustive detail, so it is certainly not *required* to reconsider these issues on remand. However, because the issue of attorney's fees as alimony in solido "is

only properly considered after the . . . issues of estate valuation and distribution are settled," *id.*, the trial court may reconsider as it deems necessary.

Husband takes issue with the procedure utilized by the trial court to deal with Wife's challenge to the fees of her former counsel. Specifically, he argues that he should have been allowed to participate in the first hearing, the purpose of which was stated by the trial court as "to determine whether or not [Wife's] objections to [Meares'] attorney charging lien are well-taken." Meares strenuously objected to Husband being present at this first hearing, citing concerns about information protected by attorney-client privilege. She notified the trial court that she had several times inquired to the Board of Professional Responsibility as to what should be done, but the BPR refused to advise her other than to cite to Tennessee Supreme Court Rule 8, RPC 1.6, which provides in pertinent part:

> (a) A lawyer shall not reveal information relating to the representation of a client unless:
> (1) the client gives informed consent;
> (2) the disclosure is impliedly authorized in order to carry out the representation; or
> (3) the disclosure is permitted by paragraph (b) or required by paragraph (c).
> (b) A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary:
>
> *          *          *
>
> (5) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client[.]

We are of the opinion that the better practice under these unusual circumstances would have been to conduct a single hearing and serially address any objections made by the client regarding claimed privileged information as they arose, determining whether Tenn. Sup. Ct. R. 8, RPC 1.6(a)(1), or (b)(5), or other potentially pertinent legal principle, may apply in each instance. This would avoid claims of unfairness or due process violation such as Husband makes here. In this case, however, Husband's claims were remedied, as best they could be, by the second hearing. The 289-page transcript from the second hearing is in the record, as is the lengthy transcript from the first hearing. As already noted, Husband had a full and fair opportunity at the second hearing to argue his case and present evidence regarding the attorney's fee award. The trial court comprehensively and independently analyzed the reasonableness and necessity of the attorney's fees and the

proof presented at the second hearing, without reference to, or application of, any res judicata principle. Under these particular circumstances, any error by refusing to allow Husband to be at the first hearing was remedied by the second hearing, and so it was not reversible error.

## C. Dissipation of Marital Assets

We next address Husband's argument that the trial court erred in finding his dissipation of marital assets as a factor in its division of the marital property. "Dissipation of assets" is statutorily defined at Tenn. Code Ann. § 36-4-121(5)(B) as "wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed." In *Larson-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010), the Supreme Court explained the concept of dissipation as follows:

> Whether dissipation has occurred depends on the facts of the particular case. 24 Am.Jur.2d Divorce and Separation § 526 (2009). The party alleging dissipation carries the initial burden of production and the burden of persuasion at trial. *Burden v. Burden*, 250 S.W.3d 899, 919 (Tenn. Ct .App. 2007), *perm. to app. denied*, (Tenn. Feb. 25, 2008). Dissipation of marital property occurs when one spouse wastes marital property and thereby reduces the marital property available for equitable distribution. *See Altman v. Altman*, 181 S.W.3d 676, 681–82 (Tenn. Ct. App .2005), *perm. to app. denied*, (Tenn. Oct. 31, 2005). Dissipation "typically refers to the use of funds after a marriage is irretrievably broken," *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006), is made for a purpose unrelated to the marriage, and is often intended to "hide, deplete, or divert" marital property. *Altman*, 181 S.W.3d at 681-82. In determining whether dissipation has occurred, trial courts must distinguish between dissipation and discretionary spending. *Burden*, 250 S.W.3d at 919–20; 24 Am.Jur.2d Divorce and Separation § 526 (2009). Discretionary spending might be ill-advised, but unlike dissipation, discretionary spending is typical of the parties' expenditures throughout the course of the marriage. *Burden*, 250 S.W.3d at 919-20.

The trial court found that Husband engaged in a pattern of mingling business and personal assets and debts, pulling out excess cash from various property transactions, and hiding assets in an attempt to keep them from Wife after the divorce was filed. The court made the following findings, as pertinent to the dissipation issue:

18

Exhibit 290 shows Husband was contending his total assets were $1,400,000. This is a compilation of various financial statements beginning in 1998 provided to the Court. . . . On Exhibit 290(B), a financial statement filled out on November 6, 2009, Husband stated his assets were worth $3,500,000 and he had a salary of $100,000, with notes receivable of $600,000. . . . On Exhibit 290(D), the personal financial disclosure dated March 1, 2012, Husband represented that his total net worth was $3,464,000. He again stated his salary was $135,000 per year, that he had a notes receivable of $600,000, and that his ownership in QMS was valued at $1,650,000. After the divorce was filed in 2011 and while the parties were involved in a bitter divorce on appeal in 2014, the 2014 financial statement reveals Husband's opinion that his total assets were approximately $2,546,000. Exhibit 290(G) showed much the same. Interestingly, Exhibit 290(H) reduces Husband's cash on hand to $10,000 versus the $100,000 it was previously, and no longer records any notes receivable in excess of $600,000, as had been carried on the previous financial statements, and Husband claimed a net worth of $2,750,000. There has been no explanation provided to this Court as to the disposition of the $600,000 notes receivable by Husband, and is possibly in violation of the statutory injunction in divorce cases.

\*     \*     \*

Mr. Triplett and Husband combined several of their other notes in June 2014 and again in December 2016 and borrowed $1,785,000 known as the "Campus Loan." The campus loan encumbered several pieces of property, some separate property of Husband, and all marital property of the parties. This was in violation of the statutory injunction. This campus loan provided funds to be used to add on to the QMS building and also **returned cash to Husband**. While Mr. Triplett testified that certain monies came out of this campus loan to pay off other debts, there was no proof offered of that during this trial. . . . Mr. Triplett admitted his recitation of the disbursements from the campus loan were a proposal. He does not know what Husband actually did with his portion of the proceeds.

\*     \*     \*

Wife has alleged the "Campus Loan" was a way to bleed off some of the equity in the property and place it outside her reach. In support of that theory, Wife provided Exhibit 315 and Exhibit 198. Exhibit 198 showed that during the pendency of this divorce, Husband received $182,054.55 excess cash at a closing in 2016. Additionally, on March 24, 2014, Husband received

19

$62,451.72 excess cash from the closing. On June 27, 2014 Husband received $77,299.12 excess cash at closing. Without approval of the Court, Husband sold several assets and was able to keep the proceeds.

\* \* \*

Husband does not keep his business and personal expenses separate. . . . Several other documents, including Exhibits 312 and 313, indicate Husband received cash, during the pendency of this divorce, which remains unaccounted for. Husband took unaccounted for cash out of his businesses in the amount of $321,805 per Exhibit 198. The Court also finds the unexplained disappearance of the $600,000 in notes receivable, makes ready division of marital assets a frustrating proposition.

The issue of dissipation is a fact-intensive question. *Larson-Ball,* 301 S.W.3d at 235. It is also a question that often hinges on the trial court's assessment of the demeanor and credibility of witnesses at trial, as in this case. *See, e.g., Halkaides v. Halkaides*, No. W2004-00226-COA-R3-CV, 2004 WL 3021092, at \*4 (Tenn. Ct. App. Dec. 29, 2004) (where "considerable sums simply disappeared from the [husband's] business" and husband "simply has failed to bring forth credible evidence demonstrating that the funds were used legitimately and not dissipated," "[w]e afford great deference to the trial court's determinations on matters of witness credibility, and the evidence does not preponderate against the trial court's findings that [the husband] dissipated at least $100,000 in marital assets.").

In the present case, Husband has not pointed to evidence in the record that tends to preponderate against the above-quoted factual findings. He argues that "failing to recall a line item on a ten-year-old financial statement does not amount to dissipation," quickly glossing over the fact that this "line item" is six hundred thousand dollars in "notes receivable." Giving due deference to the trial court's perspective of witness credibility, among other things, we hold it did not err in its analysis of asset dissipation as a factor in the distribution of the marital estate.

### D. Alimony in Futuro

Our standard of review of the trial court's decision to award Wife $3,600 per month in alimony in futuro is as stated by the Supreme Court:

For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. This well-established principle still holds true today, with this Court repeatedly

20

and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award.

Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision.

*Gonsewski*, 350 S.W.3d at 105-06 (internal citations and footnote omitted).

A trial court's award of spousal support is governed by Tenn. Code Ann. § 36-5-121(i), which provides:

In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

21

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

The marriage lasted from late 1996 until Husband filed in 2011. They had been litigating the divorce case for nearly eight years at time of trial. At that point, in 2019, Wife was 54 years old and Husband was 71. Husband testified that he was retired, but the evidence was not entirely consistent regarding when he retired and how much work he continued to do for his companies thereafter. Wife did not work outside the home during the marriage, but she did draw a "salary" from Wedgecorp. The trial court found as follows in its alimony analysis:

During the pendency of the divorce, Husband paid Wife anywhere from $41,000 to $43,000 per year as her spending money. She used this money for herself and the child, as well as projects improving the home. She is requesting *alimony in futuro* as she has been out of the job market for more than twenty years. Her previous jobs include doing data entry, secretarial

22

work, and working in a factory. She is currently attempting a career in real estate; however, this career does not seem to produce adequate amounts of income to sustain her, nor meet her reasonable needs.

. . . The Court specifically finds Wife is unable to achieve, with reasonable effort, an earning capacity that will permit her standard of living after the divorce, to be reasonably comparable to the standard she enjoyed during the marriage or the post-divorce standard of living of Husband.

\*　　\*　　\*

It is clear in this case that Wife's earning capacity is much less than that of Husband. There will be certain needs that she [will have] including but not limited to, her car is currently older, a place to live, and health insurance, that beginning a new career at this point in her life may be unable to meet. She certainly has no pension, profit sharing, retirement plans, or other resources to obtain monies to sustain herself. The parties have each cashed in their retirement accounts.

Both parties have the same relative education. Wife will probably need to secure further education and/or training to improve her earning capacity to a reasonable level. Each party appears to be in good mental and physical condition. The parties' child has now attained the age of majority and Wife no longer needs to stay at home to take care of him. Husband has a large amount of separate assets, both real and personal, particularly compared to Wife's lack of assets. The Court has been forced to divide the marital property in such a way that does not provide Wife with assets without the need for alimony. The parties enjoyed a nice standard of living during the marriage, taking many trips with "clients" and friends.

Wife has made both tangible and intangible contributions to the marriage, as a homemaker and mother. She has also taken care of things in the home, so Husband could spend the majority of his time "developing and entertaining clients to increase the value of his business." Both parties are at fault for this divorce; however, Husband's fault in staying out multiple nights during the week and coming home intoxicated, certainly weighs heavier in the fault category.

It is axiomatic that "the two most important factors considered are the need of the disadvantaged spouse and the obligor spouse's ability to pay." *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Gonsewski*, 350 S.W.3d at 110. The trial court determined that

Wife had the need for, and Husband the ability to pay, alimony in futuro of $3,600 per month. Wife's testimony reveals that her efforts to get into real estate sales prior to trial were almost entirely unsuccessful. The trial court found that Wife "has made approximately minimum wage for the past two (2) years," and the evidence does not preponderate against this finding. The trial court reviewed Wife's statement of income and expenses, removed some of the estimated expenses it found to be inflated or unreasonable, and concluded that Wife established a monthly deficit of $3,599 per month.

Regarding Husband's income, the trial court found:

In earlier hearings, regarding alimony pendente lite, the Court found Husband was hiding some of his income. . . At the hearing in July 2018, Husband admitted his income was, at least, $17,000 per month. This is not accurate. In that figure, he failed to include $1,200 per month he receives on the 3807 Old Tasso Road property[.] He also did not include his gambling income, which Husband testified he wins more than he loses. Exhibit 7 was Husband's affidavit of income and expenses which shows a Blythe Ferry Road expense. Husband has attempted to show he pays expenses that Wedgecorp or QMS pays.

The company, not Husband, pays the 3601 Tasso Road property payment. . . . Not included in his income in this matter is approximately $70,000 to $80,000 per year the company pays on the company's American Express bills to cover his meals for eating out, gas, and his "entertainment expenses." In trying to parse through his testimony compared to the trial exhibits, the Court finds in 2016, Husband deposited $349,000 into his checking account, $25,000 of which came from gambling. The Court finds his effective monthly income is at least $24,000 per month. Husband's monthly expenses are not reasonable and are not credible on Exhibit 7. In addition, Husband left off several sources of income, pursuant to the testimony of his business partner, Mr. Triplett.

As can be discerned from the above, Husband's efforts to obfuscate his finances by creative accounting, and a simple lack of candor and honesty, have rendered it impossible to say with certainty what his income is. The evidence does not preponderate against the trial court's findings, many of which are dependent upon its credibility determinations, and it does support the conclusion that Husband has the ability to pay alimony in futuro in the amount of $3,600 per month. The trial court applied the correct legal standards and reached a decision that is not clearly unreasonable, and consequently we affirm its alimony in futuro award to Wife.

24

## E. Attorney's Fees Incurred on Appeal

Finally, Wife asserts that she is entitled to attorney's fees on appeal. This decision is soundly within the discretion of this Court. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). "When considering a request for attorney's fees on appeal, we also consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the requesting party sought the appeal in good faith, and any other equitable factors relevant in a given case." *Chaffin v. Ellis*, 211 S.W.3d 264, 294 (Tenn. Ct. App. 2006) (citing *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005)). Under all of the circumstances of this case, we hold each party responsible for their own attorney's fees on appeal.

## V. CONCLUSION

The judgment of the trial court is modified to classify the interest in QMS as Husband's separate property. The judgment that the property located at 1455 Blythe Ferry Road is marital is vacated and remanded to the trial court for reconsideration in light of this opinion. Upon remand, the trial court may reconsider the award of attorney's fees to Wife as alimony in solido, after its reconsideration of the distribution of the marital estate, if the trial court deems it necessary. The judgment of the trial court is affirmed in all other respects. Costs on appeal are assessed one-half to the appellant, Claude Ellis, and one-half to the appellee, Melisa Jane Godfrey Ellis, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE